**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TAOTAO USA, INC.                              )
2201 Luna Road.                               )
Carrollton, Texas 75006                       )
                                              )
    and                   )
                                              )
TAOTAO GROUP CO., LTD.,                       )
No. 6 Xinmin  Road. Jinyun County, Lishui City, )
Zhejiang, China                               )
                                              )
    and                   )
                                              )
JINYUN COUNTY XIANGYUAN INDUSTRY              )
CO., LTD.,                                    )
Xinbi lndustrial Zone, Xinbi Town, Jinyun County, )
Zhejiang, China                               )
                                              )
    Plaintiffs,            )
                                              )
v.                                            ) CIVIL ACTION NO. 1:20-cv-915
                                              )
UNITED STATES ENVIRONMENTAL                   )
PROTECTION AGENCY, and                        )
PHILLIP A. BROOKS, Director, Air              )
Enforcement Division, Office of Civil         )
Enforcement, Office of Enforcement,           )
1200 Pennsylvania Ave., N.W.                  )
Mail Code 1101A                               )
Washington, DC 20460                          )
                                              )
    Defendants.            )

## COMPLAINT

COME NOW Plaintiffs Taotao USA, Inc. ("Taotao USA"), Taotao Group Co. Ltd.

("Taotao Group") and Jinyun County Xiangyuan Industry Co., Ltd. ("JCXI"), by and through their

undersigned counsel, and respectfully file this Complaint for judicial review of an administrative

order of the United States Environmental Protection Agency ("EPA"). Plaintiffs set forth their

claim for relief as follows:

## INTRODUCTION

1.      Plaintiffs bring this action pursuant to the Administrative Procedure Act ("APA") 5 U.S.C.

§§ 701-706, and section 205(c)(5) of the Clean Air Act ("CAA"), 42 U.S.C. § 7524(c)(5), to obtain

judicial review of March 5, 2020 "Final Decision and Order" of the EPA's Environmental Appeals

Board ("EAB") (hereinafter the "Final Order").

2.      The EAB's Final Order upheld the August 7, 2018 "Initial Decision" of the Administrative

Law Judge ("ALJ") (hereinafter the "Initial Decision"), which assessed a joint and several civil

penalty of $1,601,149.95 against Taotao USA, $247,982.55 against Taotao Group and

$1,353,167.40 against JCXI.

3.      In its Final Order, the EAB affirmed the ALJ's finding that Plaintiffs were jointly and

severally liable for violations of CAA sections 203(a) and 213(d) (to the extent section 213 permits

EPA to enforce emission standards for nonroad vehicles in the same manner as the motor vehicles

regulated under section 203 of the CAA, 42 U.S.C. §§ 7522(a), 7547(d), and implementing

regulations codified in 40 C.F.R. Part 86, Subpart E and 40 C.F.R. §§ 1051, 1068, as follows:

    a.   Taotao USA for importing 109,964 uncertified new vehicles, comprised of 67,527 highway

       motorcycles and 42,437 recreational vehicles;

    b.   Taotao Group for manufacturing, offering for sale, or introducing or delivering for

       introduction into commerce the uncertified highway motorcycles; and

    c.   JCXI for manufacturing, offering for sale, or introducing or delivering for introduction into

       commerce the uncertified recreational vehicles.

4.      In its Final Order, the EAB also affirmed the ALJ's assessment of civil penalty, which held

Taotao USA jointly and severally liable for the total penalty amount of $1,601,149.95; Taotao

Group jointly and severally liable with Taotao USA for $247,982.55 of the total penalty; and JCXI jointly and severally liable with Taotao USA for $1,353,167.40 of the total penalty.

5.      In its Final Order, the EAB affirmed the ALJ's determinations that EPA properly executed service of process upon them and that said service met due process requirements.

6.      For the reasons set forth herein, the EAB's Final Order is (i) arbitrary, capricious, an abuse of discretion, or is otherwise not in accordance with law; (ii) contrary to Plaintiffs' constitutional due-process rights; (iii) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (iv) without observance of procedure required by law. Plaintiffs respectfully request that this Court review the EAB's Final Order, and hold unlawful and set aside said Final Order in its entirety, or otherwise remand this matter to the EAB for issuance of an order absolving Plaintiffs of liability.

## PARTIES

7.      Plaintiff Taotao USA is a corporation organized under the laws of Texas and its principal place of business is located in Dallas County, Texas.

8.      Plaintiff Taotao Group is a corporation organized under the laws of the People 's Republic of China and is located in Zhejiang, China.

9.      Plaintiff JCXI is a corporation organized under the laws of the People 's Republic of China and is located in Zhejiang, China.

10.     Defendant EPA is an agency of the United States of America, headquartered in Washington, DC, and charged with enforcement of the CAA and implementing regulations, including the assessment and enforcement of penalties for violations of the CAA.

11.     Defendant Phillip A. Brooks is the Director of Air Enforcement Division, Office of Civil Enforcement, Office of Enforcement and Compliance Assurance, and brought the underlying civil administrative penalty assessment proceedings against Plaintiffs.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to section 205 of the CAA, 42 U.S.C. §§ 7524, and 28 U.S.C. §§ 1331.

13.     The EAB's Final Order constitutes the final action of the EPA and is subject to review in this Court. *See* 40 C.F.R. §§ 22.30(f), 22.3 l(a); 5 U.S.C. § 704.

14.     Venue is proper in this jurisdiction pursuant to Section 205(c)(5) of the CAA, 42 U.S.C. § 7524(c)(5).

## STATUTORY & REGULATORY BACKGROUND

15.     EPA has developed emission standards that apply to new motor vehicles and engines as well as nonroad vehicles and engines throughout their entire useful lives. *See* CAA §§ 202(a), (d), 213(a), 42 U.S.C. §§ 7521(a), (d), 7547(a). EPA enforces these emission standards through a mandatory pre-market testing and certification program to confirm that motor vehicles and engines and nonroad vehicles and engines will conform to the applicable emission standards set forth in the regulations. CAA §§ 206(a)(1), 213(d), 42 U.S.C. §§ 7525(a)(1), 7547(d); 40 C.F.R. §§ 86.407-78, 1051.101, 1068.101(a)(1).

16.     The CAA prohibits manufacturers from selling or offering for sale, introducing or delivering for introduction into commerce, or importing into the United States a vehicle and/or vehicle engine unless it is covered by a certificate of conformity ("COC") issued under applicable regulations. CAA § 203(a)(1), 42 U.S.C.§ 7522(a)(1).

17.     The EPA does not issue COCs to foreign manufacturers, so only a U.S. manufacturer or U.S. importer can apply for, and hold, a COC.

18.     To obtain a COC, a U.S. manufacturer or importer submits a COC application to EPA for each Model Year and for each engine family, along with emissions data collected by conducting emissions tests on a test vehicle, also referred to as the emission data vehicle (EDV) until reaching the end of the engine's "useful life."

19.     To obtain a COC for the same engine family previously covered by a COC but for a different model year, the manufacturer or importer may recertify the engine family by submitting a carry-over application, and submit the same emissions data from the original EDV, regardless of when it was tested or produced.

20.      The EPA regulation applicable to motor vehicles states that in case of new motor vehicles produced by manufacturers whose projected sale in the United States is 10,000 or more, the COC "will cover all vehicles represented by the test vehicle and will certify compliance with no more than one set of applicable standards." 40 C.F.R. 86.437-78.

21.     In case of non-road or recreational vehicles, the applicable EPA regulation states " Engines/equipment covered by a certificate of conformity are limited to those that . . . conform to the specifications described in the certificate and the associated application for certification." 40 C.F.R. 1068.103(a).  The very next sentence that precedes the above-quoted language defines the term "specifications." *Id.* ("For the purposes of this paragraph (a), 'specifications' includes the emission control information label and any conditions or limitations identified by the manufacturer or EPA.). The EPA takes the position that predecessor regulation, which was applicable prior to December 2016, is applicable in this case. Said previous version of the

regulation defines "specifications" to include any conditions or limitations identified by the manufacturer or EPA.

22.     In case of catalytic converters, EPA has no design standards, nor is it possible to assess a catalytic converters design by simply looking at it; the only way to test a catalytic converter's performance is to test it for emissions to the end of its useful life.

## FACTUAL AND PROCEDURAL BACKGROUND

23.     This case involves ten COCs issued to Taotao USA for vehicles belonging to different engine families, or the same engine families with different model years as follows: ETAOC.049MC2 (count 1[1]), DTAOC.150MC2 (count 2), DTAOC.049MC2 (count 3), CTAOC.049MC1 (count 4), ETAOX012AIT (count 5), DTAOX0.15G2T (count 6), DTAOX.124AAA (count 7), DTAOXO.12A1T (count 8), FTAOX0.15G2T (count 9), and GTAOX0.15G2T (count 10).

24.     In 2011 to 2015, Taotao USA filed the COC applications for the above-mentioned COCs to certify vehicles for the model years 2012-2016. All but one of those applications were carry-over applications, meaning that nine of those COC applications relied on test vehicles tested in previous years.

25.     Although ten separate COC applications were filed for the 109,964 vehicles that are the subject of this lawsuit, the applications (including the stated designs) for some of these engine families were exactly the same and were resubmitted solely based on the model years for which certification was sought.

   a.   COC applications and test vehicles for engine families DTAOC.049MC2 (count 3) and ETAOC.049MC2 (counts 1) were essentially the same except the COC for the former was

---

[1] The count numbers asserted herein are based on EPA's Amended Petition in the administrative action before the ALJ.

submitted for model year 2013, and the latter was simply resubmitted to renew the certification for model year 2014;

b. COC applications for engine families DTAOX012A1T (count 8) and ETAOX012AIT (count 5) were essentially the same except the former was submitted in 2013 to recertify a previously certified engine family, and then again resubmitted for recertification for 2014 as ETAOX012AIT; and

c. COC applications for engine Families DTAOX0.15G2T (count 6), FTAOX0.15G2T (count 9) and GTAOX0.15G2T (count 10) were essentially the same except the first was submitted for model year 2013 recertification of a previously certified engine family, then resubmitted as FTAOX0.15G2T (count 9) for 2015, and again as GTAOX0.15G2T (count 10) for 2016.

26.    In each of the ten subject COC applications, Taotao USA disclosed that the catalytic converters were manufactured by one of two unrelated Chinese manufacturing companies, Nanjing Enserver Technology Co. Ltd ("Nanjing Enserver") or Beijing ENTE Century Environmental Technology Co., Ltd ("Beijing ENTE"). In total, there were five separate catalytic converter compositions stated in each of the ten COC applications.

27.    In 2010 and 2011, Taotao USA had various catalytic converters purchased by both Nanjing Enserver and Beijing ENTE tested to ensure that the design specifications provided by these catalytic converter manufacturers were accurate. These catalytic converter test reports were submitted to EPA.

28.    The tested catalytic converters belonged to engine families belonging to prior model years, later recertified as ETAOXO.12A1T (count 5), DTAOX.15G2T (count 6), DTAOX.124AAA (count 7), DTAOXO.12A1T (count 8), FTAOX.15G2T (count 9) and GTAOX.15G2T (count 10).

Furthermore, evidence suggests that the same catalytic converter tested for its composition for earlier models of engine family DTAOX0.12A1T was used in, and its composition stated in the COC application for, DTAOX.124AAA (count 7)

29.    In 2012, a professional vehicle and engine consultant, retained by Taotao USA and suggested by EPA, as part of a compliance plan provided by EPA, sent three catalytic converters for testing at a laboratory in Canada.

30.    The Canadian laboratory, SGS Canada Inc. ("SGS"), and the test methods employed by SGS were approved by EPA. One of the catalytic converters tested for volume and composition belonged to engine family CTAOC.049MC1, while a second one belonged to engine family CTAOXO.12AIT, a prior model year of vehicles belonging to DTAOXO.12A1T (count 8) and ETAOXO.12A1T (count 5).

31.    Taotao USA submitted these test results to the Agency in 2012. The tests showed that all three catalytic converters had the precious metal concentrations provided by Beijing ENTE. The same catalytic converter composition/concentrations were reported in the relevant COC applications as follows: CTAOC.049MC1 (count 4), DTAOXO.12A1T (count 8) and ETAOXO.12A1T (count 5).

32.    On December 24, 2013, EPA issued a Notice of Violation stating that based on inspections of some vehicles in March 2012, June 2013 and November 2013, that revealed that the catalytic converters in those vehicles did not contain active material in the quantity or concentrations described in the vehicles' relevant  COC applications, the EPA has determined that all 64,377 vehicles imported by Taotao USA were uncertified. These vehicles were covered by eight COCs, count 1 through 8. EPA later added an additional 45,587

33.     Following the Notice of Violation, EPA required that Taotao USA conduct confirmatory tests on twenty four vehicles belonging to each of the eight counts pursuant to an EPA approved plan. Taotao USA complied, and the vehicles were tested at an EPA recognized facility, California Environmental Engineering (CEE), LLC. In 2014, CEE conducted the confirmatory tests in accordance with EPA's approved plan and all vehicles met EPA's emission standards.

34.     The catalytic converters were then removed from those vehicles and sent to SGS for testing. SGS test results showed that the catalytic converters have precious metal concentrations that were different from the compositions stated in the vehicles' COC applications.

35.     EPA thereafter initiated administrative penalty proceedings against Plaintiffs for the 64,377 vehicles, and later amended the petition to include an additional 45,587 vehicles, including those belonging to the engine family identified in counts 9 and 10.

## CAUSES OF ACTION

### I.
**The penalty sought by EPA in the administrative action exceeded the Clean Air Act's jurisdictional limitations, and therefore the ALJ had no subject matter jurisdiction over the proceedings.**

36.     The Clean Air Act ("CAA or the "Act") unambiguously limits the amount of penalty that may be sought against violators in penalty assessment proceeding up to a total penalty of $200,000, unless EPA and the Department of Justice ("DOJ") jointly determine that a matter involving a larger penalty amount is appropriate for administrative penalty assessment.

37.     Here, EPA initially sought a proposed penalty of $3,295,556.32 ($1,698,432.42 from Taotao USA and T-Group, and $1,597,123.89 from Taotao USA and JCXI), and later reduced the proposed penalty to $1,601,149.95 shortly before the hearing.

38.    Evidence shows that that the only joint-determination by the EPA and the DOJ was for violations that harm the regulatory scheme, but that do not cause excess emissions; and--of provisions on certification, labeling, incorrect information in manuals, or warranty information violations.   Further, evidence shows DOJ did not join EPA's determination to waive the jurisdictional limit for violations that  that go beyond mere harm to the regulatory scheme, that cause excess emissions; that are other than violations of provisions on certification, labeling, incorrect information in manuals, or warranty information violations; or that are willful, knowing, or otherwise criminal; or that increase the aggregate number of waived vehicles in the matter to over 125,000 total.

39.    Although CAA waiver determinations are not subject to judicial review, nor are such determinations, the Court may determine whether there was a joint EPA and DOJ determination in a particular case that authorized the administrative action or order.

40.    Here, the penalty assessed against Plaintiffs went beyond mere harm to the regulatory scheme and it is undisputed that in assessing the penalty, the EPA considered actual or potential harm from excess emissions. Further, the penalty was adjusted upwards to include amounts attributable to Plaintiffs' willfulness.

41.    Because the penalty was assessed for violations for which the DOJ expressly refused to waive the CAA jurisdictional limits, the ALJ and EAB abused their discretion in assessing penalties against Plaintiffs that far-exceeded the limits set forth in the CAA, and had no jurisdiction over this matter.

**II.**
**The Final Order is arbitrary, capricious and contrary to the law because there was no evidence of any harm to the regulatory scheme.**

42.     As mentioned previously, the DOJ only waived the statutory penalty cap for violations that did not go beyond mere harm to the regulatory scheme. EPA failed to establish that Plaintiffs alleged violations caused any regulatory harm.

43.     Because the ALJ's regulatory harm determinations were based on an impossibility, and EPA's argument to establish regulatory harm contradicted its argument to establish liability, any finding of harm to the regulatory scheme in the Initial Decision and the Final Order was arbitrary, capricious and contrary to the law.

44.     At the liability phase, EPA asked the ALJ to take Plaintiffs statements that all the subject vehicles matched their relevant test vehicles, and remove the matter from controversy. EPA did this to establish that all the catalytic converters on all 109,964 imported subject vehicles had catalytic converters that did not match the catalytic converters described in their relevant COC applications, even though only 33 such catalytic converters were analyzed for these proceedings.

45.     In making her liability determination, the ALJ referred to Plaintiffs above-mentioned statements, and held, as requested by the EPA, and that because all vehicles were identical to their test vehicles, they did not conform to their COC description, were therefore uncertified.

46.     However, at the penalty phase, the EPA contradicted its own prior position that all vehicles matched the test vehicle, and this time took the position that Plaintiffs imported vehicles which were not tested for emissions, essentially claiming  the imported vehicles did not match their test vehicles, and therefore Plaintiffs violations harmed the regulatory scheme.

47.     The EPA is judicially estopped from prevailing on an argument in one phase of the proceedings and then taking a contradictory position in the other phase of the same proceedings.

48.     Furthermore, the ALJ found, and EAB affirmed, that Plaintiffs harmed the regulatory scheme by importing untested vehicles because even though the subject vehicles were identical

to their respective test vehicles, tested for useful life emissions, the test vehicles were manufactured in a different year and therefore unreliable.

49.     The ALJ's foregoing argument in support of the finding of harm to the regulatory scheme is arbitrary and capricious, and contrary to the law, because EPA's regulations require that test vehicles (EDVs) be manufactured in previous years. Furthermore, given that all but one of the COC applications were carry-over applications, approved by the EPA, and carry-over applications by their very nature are based on test results submitted in preceding applications, based on tests conducted on test vehicles that were produced prior to the year the original COC application for the engine family was submitted.

50.     If the ALJ's position that harm to the regulatory scheme occurred because no full useful life emission results from the imported vehicles produced in the year that they were imported were available is adopted, then every vehicle ever produced in, or imported into, the United States since the implementation of the CAA has harmed the regulatory scheme. Because COC applications, and emission test results, are submitted in the year prior to the model year in which they are intended to be produced/imported, it is impossible for test vehicles to be manufactured in the same year as the model year for which the COC is sought.

### III.
**EPA abused its discretion by holding Taotao USA and Taotao Group liable because (1) the 67,527 highway motorcycles imported by Taotao USA were covered by their respective certificates of conformity, and (2) the EPA's determination went against the clear language of its own regulations.**

51.     The ALJ found, and EAB affirmed, Taotao USA and Taotao Group liable for violating CAA § 203(a), and implementing regulations codified in 40 C.F.R. Part 86, Subpart E.[2]

---

[2] The Final Order additionally found Plaintiffs liable for violating CAA § 213(d), and implementing regulations 40 C.F.R. §§ 1051, 1068, but CAA § 213(d) and these additional regulations only apply to non-road, i.e. recreational, vehicles.

52.     But all of the subject highway vehicles imported by Taotao USA were covered by an EPA-issued COC.

53.     The implementing regulations codified in 40 C.F.R. Part 86, Subpart E, clearly state that a COC covers all vehicles represented by the test vehicle, and will certify compliance with no more than one set of applicable standards.

54.     EPA judicially admitted that all highway motorcycles in this case were the same as their respective test vehicle. Alternatively, EPA presented no evidence to show that the catalytic converters on the subject highway vehicles did not conform to the catalytic converters on the test vehicles, all of which were purchased from the same third-party catalytic converter manufacturers.

55.     Yet, the ALJ found that the highway vehicles were uncertified because they not only needed to conform to the test vehicles but also the catalytic converter composition described in their COC applications. The ALJ relied on the language stated on the face of each COC. However, the regulation that provided for said language to be state on the face of a COC has since been deleted, and the new regulation contains no similar provision.

56.     Further, the language stated on the face of the COC, clearly conflicts with the language of 40 C.F.R. § 86.437-78.

57.     No deference should be afforded to the EPA because the language of the applicable regulation is unambiguous, and doing so, would permit the EPA, under the guise of interpreting a regulation, to create de facto a new regulation.

58.     Furthermore, as previously stated, there are no EPA design standards for catalytic convertors, and the only way to test their performance is to conduct emission tests, which when conducted in this case showed that the subject vehicles with the purportedly "uncertified" catalytic converters, met EPA's emission standards.

**IV.**

**EPA abused its discretion by holding Taotao USA and JCXI liable because (1) the 42,437 recreational vehicles imported by Taotao USA were covered by their respective certificates of conformity, and (2) the EPA's determination went against the clear language of its own regulations**

59.     The ALJ found, and EAB affirmed, Taotao USA and JCXI liable for violating CAA § 213(d), and implementing regulations codified in 40 C.F.R. §§ 1051, 1068.

60.     The EPA alleged that the recreational vehicles were not covered by their respective COCs because the catalytic converters on said vehicles did not match the catalytic converter composition stated in their COC applications. EPA alleged that the catalytic converter "design" stated in the COC was a design specification.

61.     However, as stated previously, 40 C.F.R. 1068.103 unambiguously defines "specifications" to include the emission control information label and any conditions or limitations identified by the manufacturer or EPA. 40 C.F.R. 1068.103(a).

62.     Nowhere in all the emission control information ("ECI") specified on each ECI label attached to all the vehicles identified in the Complaint is there any mention of the precious metal composition, nor is such "mention" required.

63.     Furthermore, even if the previous version of 40 C.F.R. 1068.103 is found to be applicable in this case, as the EPA claims, the term "specifications" is still defined to only include any conditions or limitations identified by the manufacturer or EPA.

64.     Here, none of the conditions or limitations identified in the relevant COC applications make any mention of the catalytic converter's precious metal concentrations; and the EPA admits that EPA does not have any catalytic converter design standards or specifications.

65.     However, even in the face of the clear definition of "specifications" stated, by EPA, in the very regulation that EPA has found Plaintiffs Taotao USA and JCXI liable for violating, the ALJ

determined, and EAB affirmed, that the term "specifications" was meant to be inclusive and construed broadly such that for a vehicle or engine to be covered by a COC it must conform to the specifications described in the COC application, the specifications on the emission control information label *and* any other conditions or limitations identified by the manufacturer or EPA as appropriate.

66.     In making the above determination, the EPA contradicts its own definition of specifications that is relevant to the issue of liability. EPA therefore undermines its own regulations, bypasses the "notice and comment" requirement for making regulations, and under the guise of interpreting a regulation, creates de facto a new regulation. EPA therefore abuses its discretion, and its determinations deserve no deference.

**V.**
**EPA abused its discretion by holding Taotao Group and JCXI liable for manufacturing vehicles with catalytic converters that did not match the catalytic converters described in the respective COCs applications, even though (1) EPA does not permit Taotao Group and JCXI to hold or submit COC applications, and (2) Taotao Group and JCXI did not manufacture the catalytic converters**

67.     The EPA only permits U.S. manufacturers or importers to submit COC applications and become COC holders. Foreign manufacturers are not able to apply for, or hold COCs and directly ship their vehicles to dealers for sale.

68.     Each COC application in this case clearly specified that catalytic converters were manufactured by two third-party Chinese catalytic converter manufacturers: Nanjing Enserver and Beijing ENTE.

69.     The catalytic converters purchased from these two Chinese manufacturers were analyzed for precious metal concentrations and the results were submitted to the EPA prior to the Notice of Violation in this case.

70.     The issue in this case is not that the vehicles manufactured had no COCs, nor that the vehicles or parts manufactured by Taotao Group and JCXI failed EPA emission standards. The issue is that 33 test results show that the catalytic converters purchased from Nanjing Enserver and Biejing ENTE were not in the composition that is stated in Taotao USA's COC application.

71.     Because Taotao Group and JCXI ((a) did not manufacture the catalytic converters, (b) did not provide the catalytic converter information stated in the COC applications, (c) did not submit the COC application, (d) did not, and could not by EPA regulations, directly deliver the vehicles to dealers to be sold in the United States, (e) produced, or exported, the vehicles only after COCs for those vehicles were issued to Taotao USA, and (f) the vehicles met EPA's emission standards, Taotao Group and JCXI cannot be held liable as manufacturers under the CAA.

72.     As stated previously, the CAA only prohibits manufacturers, in this case, from causing vehicles to be sold into the United States unless those vehicles are covered by a COC. Here the vehicles built by Taotao Group and JCXI were covered by COCs, and met EPA emission standards.

73.     Even if the EPA determined that the vehicles were not covered by their COCs because the catalytic converter information supplied to Taotao USA by Nanjing Enserver and Beijing ENTE, and to the EPA by Taotao USA, was inaccurate, it could not hold Taotao Group and JCXI liable as manufacturers under the CAA.

74.     The EPA cannot on one hand prevent foreign manufacturers from applying for, or holding COCs, thereby excluding them from the definition of "manufacturer" under the CAA, and on the other hand, hold such foreign entities liable for violating a regulation that applies only to U.S. manufacturers because they "caused" the vehicle to be sold in the United States by delivering it to a U.S. importer/COC holder.

75.     The former Director of EPA's Air Enforcement Division, as well as EPA's enforcement officer or employee, have themselves stated that ". . . some of EPA's challenges in enforcing the Clean Air Act with regard to consumer products originate from the fact that EPA's regulations limit liability to the importer of the illegal goods, not the foreign manufacturer of the product or the retailer selling the illegal product."

76.     EPA cannot take a position contrary to its own prior interpretation, which limits liability to U.S. importers.

77.     The EPA's contradicting interpretations of the term "manufacturer" to fit its own agenda is an abuse of discretion, as is the finding that Taotao Group and JCXI are liable for violating the CAA.

### VI.
### EPA's service of process on Taotao Group and JCXI violates the due process clause, and EPA's service of process failed to comply with the Hague Convention.

78.     On November 16, 2015, the Agency served the Complaint on T-Group and JCXI by personally delivering copies to Matao Cao, President of Taotao USA, Inc. The Complaint was not translated in the official language of the recipients, Chinese/Mandarin.

79.     Following said service, T-Group and JCXI specially appeared for the purpose of filing a Motion to Quash and Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(5) and Brief in Support thereof ("Motion to Quash").

80.     The ALJ erroneously denied, and the EAB affirmed said denial of, Taotao Group and JCXI's Motion to Quash insufficient service of process.

81.     Under the Hague Convention, all service requests from other signatory nations, such as the United States, to defendants in signatory nations, such as China, must be effectuated in China by sending the request to China's central authority.

82.     Furthermore, the mandatory designation of a U.S. agent for service of process pursuant to the EPA's Consolidated Rules of Practice violates the Due Process Clause.

83.     Taotao Group and JCXI do not conduct business in the United States, they do not have a parent-subsidiary relationship with Taotao USA, and do not have common owners/directors. Furthermore, Taotao Group and JCXI, as foreign entities, are not even to acquire COCs.

84.     Taotao Group and JCXI only appointed Taotao USA, Inc., as their designated agent for service of process because EPA regulations require it.  *See* 40 C.F.R. §§ 86.416-80(a)(2)(ix), 1051.205(w). The appointment was not voluntary consent for purposes of due process.

85.     By requiring that foreign manufacturer's name a U.S. agent for certification purposes, while simultaneously prohibiting foreign manufacturers from holding such certificates, the regulations serve no purpose other than to circumvent the Hague Convention, as well as its notice and translation requirements.

86.     Because the regulations violate due process, and a United States Treaty, there is compelling reason for the Court to grant review of the EPA's above-mentioned regulations.

## VII.
**EPA abused its discretion is assessing penalties against Plaintiffs because EPA's Penalty Policy does not provide an appropriate framework in the unique circumstances of this case; the assessment ignores the Plaintiff-specific application of the statutory factors; the assessment exceeds the scope of the Penalty Policy itself**

87.     As mentioned previously, the EPA could only bring an administrative proceeding in this matter, given the amount of penalty sought, if the penalty was for harm to the regulatory scheme, and not from excess emissions or Plaintiffs' willfulness.

88.     Yet, the EPA relied on a Penalty Policy that is based on harm from actual or potential emissions. The gravity component under said Penalty for violations involving uncertified vehicles

is calculated to be proportional to the vehicle's engine size because, as the policy states, the amount of emissions and potential for excess emissions is proportional to the engine size.

89.    While the Penalty Policy does acknowledge circumstances where violations do not cause harm in the form of excess emissions, in which case, the seriousness of the violation depends on its effect on the regulatory program, the Penalty Policy does not provide a framework for calculating such a penalty.

90.    Therefore, the penalty, as calculated by EPA, was based largely on harm excess emissions. Furthermore, EPA increased the penalty against Plaintiffs to account for willfulness or knowing conduct.

91.    Furthermore, the EPA increased the penalty by assessing counts 1-8 as moderate in terms of egregiousness because the confirmatory tests conducted on these vehicles at CEE were low hour/low milage tests. However, the EPA itself approved the plan for low hour/mileage testing, and EPA regulation states that confirmatory tests are conducted at low hour/low mileage as opposed to full useful life. Therefore, the EPA required that Plaintiff Taotao USA conduct, and pay for, confirmatory low hour/mileage tests on twenty four vehicles, and thereafter, even though the tests showed that the vehicles met EPA emission standards, increased the penalty against Plaintiffs by claiming that the low hour/mileage tests are not enough to show that the vehicles will not cause potential excess emissions, and only full useful life tests can do that.

92.    The EPA increased the penalty sought against Taotao USA and JCXI by applying assessing the violations in counts 9 and 10 as Major in terms of egregiousness because there were no confirmatory tests for counts 9 and 10.

93.    Counts 9 and 10 were carry over applications and therefore representative of their previous model year, in this instance vehicles belonging to count 6. The confirmatory tests at CEE on count

6 vehicles represented vehicles belonging to counts 9 and 10 according to EPA's own policy, certification procedures and regulations. Therefore, EPA did have confirmatory test results for said vehicles and therefore all counts should have been assessed similarly in terms of egregiousness.

94.     Furthermore, the EPA did not lower the penalty for vehicles imported before the Notice of Violation was issued, i.e. before Plaintiffs had any knowledge of the issue with catalytic converter compositions, but increased the penalty drastically for count 9 and 10 violations by restarting for scaling purposes because those vehicles were imported after the Notice of Violation was issued.

95.     Had EPA simply followed the Penalty Policy by grouping all counts together for scaling purposes, capping base-per-vehicle gravity at $500, and categorizing counts 9 and 10 at "Moderate" egregiousness, the gravity component of the proposed penalty would go down from $1,381,850.95 to approximately $693,455.20.

96.     Had EPA removed the portion of the penalty attributable to willfulness and negligence, the gravity component would further go down to approximately $594,390.16.

97.     EPA's penalty assessment ignores Plaintiff-specific application of the statutory factors. The penalty assessed against Taotao Group and JCXI is increased to account for history of violation, even though there was no evidence of any such previous violation by said Plaintiffs.

**PRAYER**

98.     WHEREFORE, Plaintiffs pray that this Court hold unlawful and set aside the EAB's Final Decision in its entirety or otherwise remand this matter to the EAB for issuance of an order absolving Plaintiffs of liability, or grant any other relief this Court deems appropriate. Plaintiffs further prays that they be awarded their costs and expenses incurred herein and in the proceedings below, including attorneys' fees, and that this Court render such other and further relief it deems just and proper.

DATED: April 6, 2020.

Respectfully submitted,

By: _/s/_____
Bart Colombo
Bar No. 444792
SABOURA, GOLDMAN &
COLOMBO, P.C.
312 E. Market Street, Suite F
Leesburg, VA 20176
Telephone: (703) 373-7577
Facsimile: (703) 443-0432
bcolombo@sabouralaw.com
**Attorney for Plaintiffs**