# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TAOTAO USA, INC., *et al.*,

Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

Defendants.

Civil Action No. 20-cv-915 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiffs Taotao USA, Inc. ("Taotao USA"), Taotao Group Co., Ltd. ("Taotao China"), and Jinyun County Xiangyuan Industry Co., Ltd. ("Jinyun") bring this action against the United States Environmental Protection Agency ("EPA") and a Director of EPA's Office of Enforcement, seeking review of a decision by EPA's Environmental Appeals Board ("EAB") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and section 205(c)(5) of the Clean Air Act ("CAA"), 42 U.S.C. § 7524(c)(5). Compl. ¶ 1, ECF No. 1. The challenged EAB decision, issued on March 5, 2020, affirmed an Administrative Law Judge ("ALJ") decision holding plaintiffs jointly and severally liable for the manufacture and importation into the United States of 109,964 highway motorcycles and recreational vehicles, in violation of CAA sections 203(a) and 213(d), and assessing a civil penalty totaling $1,601,149.95. *See* EAB Final Decision and Order (Mar. 5, 2020) ("EAB Final Decision") at 42–43, J.A. at 4–5, ECF No. 30-6.[1] The EAB Final

---

[1] The Administrative Record ("AR") in this case is voluminous and, in accordance with the local rules, the parties filed a Joint Appendix, containing portions of the AR cited or otherwise relied upon for the pending motions. *See* D.D.C. LCvR 7(n); J.A. at 1, ECF No. 30. The 1975-page Joint Appendix is docketed in four separate docket entries, *see* ECF Nos. 30–33, with each entry containing separate attachments. Rather than cite to the Joint Appendix, however, the parties refer either to Bates-stamped document numbers in the larger AR or docket numbers and corresponding pages from the ALJ and EAB dockets, which has made unnecessarily cumbersome and time-consumingly difficult locating the precise document referenced by the parties. For ease of reference, throughout this

Decision turned on a critical finding that plaintiffs' vehicles contained catalytic converters that did not conform to the design specifications described in their applications for certificates of conformity, rendering the vehicles not in conformity, in all material respects, to the information provided in their applications, with the result that the vehicles were not covered by a valid certificate of conformity ("COC") authorizing their importation into the United States. *Id.* at 56–57.

Pending before the Court are the parties' cross-motions for summary judgment. *See* Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 23; Defs.' Cross-Mot. Summ. J ("Defs.' Mot."), ECF No. 24. For the reasons set out below, defendants' cross-motion is granted, and plaintiffs' motion is denied.

## I.  BACKGROUND

Following review of the applicable statutory and regulatory framework under the CAA, the relevant factual and procedural background is summarized below.

### A.  Statutory and Regulatory Framework

Congress enacted the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," *id.* § 7401(b)(1). The CAA was motivated by "mounting dangers to the public health and welfare" caused by "air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles." *Id.* § 7401(a)(2).

In Title II of the CAA, Congress addressed pollution problems caused by vehicle emissions by regulating emission standards for new vehicles or new vehicle engines. Specifically, the CAA requires the EPA Administrator to prescribe standards for emissions of air pollutants from new

Memorandum Opinion, citations to documents in the AR include the name of the document, the page numbers of the Joint Appendix on which the document appears, and the corresponding document numbers.

vehicles and engines, "which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7521(a)(1).  Motor vehicles and engines, as well as nonroad vehicles and engines are two of the many types of emission sources regulated under the Act.  *See id.* §§ 7521, 7547.[2]

To ensure compliance with these standards, the CAA and its regulations establish a mandatory pre-market testing and certification program through which EPA confirms that motor vehicles and their engines and nonroad vehicles and their engines conform to the applicable emission standards set forth in the regulations.  *Id.* §§ 7525(a)(1), 7547(d); 40 C.F.R. §§ 86.407-78, 86.437-78 (covering highway motorcycles); 40 C.F.R. §§ 1051.101, 1068.101(a)(1) (covering recreational vehicles).  New motor vehicles and engines and nonroad vehicles and engines may not be sold, offered for sale, introduced or delivered for introduction into commerce, or imported into the United States, unless they are covered by a COC.  42 U.S.C. § 7522(a)(1); 40 C.F.R. § 1068.101(a)(1).  COCs represent the Administrator's finding that a particular class and model year of motor vehicles or engines or nonroad vehicles or engines conforms with all of the requirements established by the applicable regulations.  42 U.S.C. § 7525(a); 40 C.F.R. § 1068.101(a)(1)(i).  A COC is, essentially, "a license that allows an automobile manufacturer to sell vehicles to the public."  *United States v. Chrysler Corp.*, 591 F.2d 958, 960 (D.C. Cir. 1979); *see also* 42 U.S.C. § 7521.

EPA regulations establish similar methods and procedures for the issuance of COCs for both highway motorcycles and recreational vehicles.  EPA's decision to issue a COC is based on

---

[2]        A motor vehicle is defined as "any self-propelled vehicle designed for transporting persons or property on a street or highway."  42 U.S.C. § 7550(2).  A nonroad vehicle is defined as "a vehicle that is powered by a nonroad engine and that is not a motor vehicle or a vehicle used solely for competition."  *Id.* § 7550(11).  The motorcycles at issue in this case fall under the category of motor vehicles and are governed by CAA regulations found in 40 C.F.R. Part 86.  *See* EAB Final Decision at 43–44, 43 n.2; 40 C.F.R. §§ 86.401-2006, 86.402-98.  Plaintiffs also manufactured and imported nonroad recreational vehicles, which are governed by the regulations in 40 C.F.R. Parts 1051 and 1068.  *See* EAB Final Decision at 43 & n.3; 40 C.F.R. § 1051.1 (listing recreational vehicles); *id.* §§ 1068.1(a)(12), (c).

the manufacturer's application for a COC, which application contains all the information needed to ensure that a vehicle meets the required emission standards and any other requirement set out in the applicable regulations. 40 C.F.R. §§ 86.407-78, 86.416-80(a) (highway motorcycles); *id.* §§ 1051.201(a)–(b), 1051.205 (recreational vehicles). Each application covers distinct engine families, i.e., "groupings [of vehicles] whose engines are expected to have similar emission characteristics throughout their useful life." *Id.* § 86.420-78(a) (highway motorcycles); *id.* § 1051.230(a) (recreational vehicles). Vehicles in the same engine family must share certain characteristics, including the number, location, volume, and composition of any catalytic converters within their engines. *Id.* § 86.420-78(b) (highway motorcycles); *id.* § 1051.230(b) (recreational vehicles). Accordingly, each application must include a description of the vehicles covered by the application as well as descriptions of their engine, emission control system, and fuel system components. *Id.* § 86.416-80(a)(2)(i) (highway motorcycles); *id.* § 1051.205(a) (recreational vehicles). The application also consists of emissions and other test data gathered from a test vehicle selected to represent the engine family seeking certification. *See id.* §§ 86.421-78, 86.423-78, 86.431-78, 86.436-78 (highway motorcycles); *id.* § 1051.235 (recreational vehicles).

Upon review of all the test reports, data, and other pertinent information submitted by the manufacturer, if the EPA Administrator "determines that a test vehicle(s) meets the requirements of the [CAA] and [the regulations governing highway motorcycles]," the Administrator will issue a COC covering all vehicles represented by the test vehicle "upon such terms as [the Administrator] may deem necessary to assure that any new motorcycle covered by the certificate will meet the requirements of the act and [the applicable regulations]." *Id.* § 86.437-78(a)(2). Similarly, for recreational vehicles, if the EPA Administrator determines that "an application is

complete and shows that the engine family meets all the requirements of [the applicable regulations] and the Act, [the Administrator] will issue a certificate of conformity for the engine family" subject to any additional conditions set by the Administrator.  *Id.* § 1051.255(a).

Notably, the regulations governing recreational vehicles specifically warn manufacturers that "[e]ngines/equipment are considered not covered by a certificate unless they are in a configuration described in the application for certification."  *Id.* § 1068.101(a)(1)(i); *see also id.* § 1068.103(a) ("Engines/equipment covered by a certificate of conformity are limited to those that . . . conform to the specifications described in the certificate and the associated application for certification.").  Additionally, for both highway motorcycles and recreational vehicles, the COC only covers vehicles manufactured during the time period specified in the certificate.  *Id.* § 86.437-78(a)(2)(ii) (highway motorcycles); *id.* § 1068.103(a) (recreational vehicles).

The CAA provides EPA with various mechanisms to enforce this complex regulatory regime.  For example, EPA may test engines or vehicles previously issued a COC to determine if they "in fact conform with the regulations with respect to which the certificate of conformity was issued," and may suspend or revoke such COC in whole or in part or as it applies to the noncompliant engines or vehicles.  42 U.S.C. §§ 7525(b)(1)–(2).  EPA may also, for purposes of enforcement, "enter, at reasonable times, any plant or other establishment of [a] manufacturer, for the purpose of conducting tests of vehicles or engines in the hands of the manufacturer[] or . . . . inspect, at reasonable times, records, files, papers, processes, controls, and facilities used by [a] manufacturer."  *Id.* § 7525(c).  When a manufacturer sells, offers for sale, introduces or delivers into commerce, or imports into the United States a new engine or vehicle that is not covered by a valid COC, or causes such acts to occur, EPA may commence a civil action to assess and recover

civil penalties up to $25,000 per noncompliant vehicle or engine.  *Id.* §§ 7524(a)–(b).[3]  "In lieu of commencing a civil action," EPA may assess civil penalties for noncompliant vehicles or engines, though it may not seek penalties exceeding $200,000 per violator "unless the Administrator and the Attorney General jointly determine that a matter involving a larger penalty amount is appropriate for administrative penalty assessment."  *Id.* § 7524(c)(1).  Such determinations to seek a larger penalty by the Administrator and the Attorney General are not subject to judicial review.  *Id.*

**B.    Plaintiffs' Applications for Certificates of Conformity and EPA's Investigation**

Taotao China, a corporation organized under the laws of the People's Republic of China, manufactures a variety of products, including ATVs and highway motorcycles.  EAB Final Decision at 46–47.  Jinyun, a subsidiary corporation of Taotao China also organized under the laws of the People's Republic of China, manufactures nonroad recreational vehicles.  *Id.* at 47.  Taotao USA, a corporation located in, and organized under the laws of, the State of Texas, is the exclusive U.S. importer of vehicles manufactured by Taotao China and Jinyun for sale to dealers in the United States and purchases no vehicles from any other supplier.  *Id.*  Plaintiffs are also connected by familial bonds.  Yuejin Cao, the owner of Taotao China and the President of both Taotao China and Jinyun, is the father of Matao Cao, the owner of Taotao USA.  *Id.*  At the time of the alleged violations at issue in this case, Matao Cao was also the President and registered agent for Taotao USA.  *Id.*

This dispute arises from plaintiffs' manufacturing and importation of 109,964 highway motorcycles and recreational vehicles purportedly covered by ten COCs.  Compl. ¶¶ 23–25.  From 2011 to 2015, Taotao USA filed ten COC applications to certify vehicles belonging to different

---

[3]    EPA periodically adjusts the maximum civil penalty amount to account for inflation.  40 C.F.R. § 19.4.

engine families or previously certified engine families under different model years. *Id.* ¶¶ 24–25. The COC applications identified either Taotao China or Jinyun as the "original manufacturer" of the vehicles referenced in the applications, with each COC application containing a "Statement of Identicality" and "Statement of Conformity." EAB Final Decision at 47–48. The Statements of Identicality confirmed that any vehicle manufactured under the covered models would be "identical in all material respects to the [vehicles] described in [the] application for certification." *Id.* In turn, the Statements of Conformity acknowledged that all vehicles manufactured and assembled by Taotao China or Jinyun were, or would be, compliant with EPA regulations applicable to each engine family. *Id.* at 48. The ten COC applications also identified the vehicles' catalytic converter as an "emission related part" and provided detailed descriptions of the catalytic converters used for each engine family, including the ratio of precious metals—platinum, palladium, and rhodium—within each catalytic converter. *Id.* EPA issued COCs for all ten applications. Compl. ¶ 23.

In March 2012, EPA began inspecting shipments of highway motorcycles and recreational vehicles built by Taotao China and Jinyun and imported by Taotao USA. ALJ Initial Decision (Aug. 7, 2018) ("ALJ Initial Decision") at 12, J.A. at 13, ECF No. 31-19.[4] Based on this first round of inspections, EPA sent plaintiffs a Notice of Violation in regard to 64,377 vehicles, spanning eight engine families, which were manufactured and imported by plaintiffs in violation

---

[4] This is not the first time Taotao USA has been found by EPA to have imported vehicles that failed to match the design specifications described in the corresponding COC applications. Prior to the events giving rise to the instant dispute, EPA found that Taotao USA imported approximately 4,000 vehicles, in violation of 42 U.S.C. § 7522(a)(1), because the imported vehicles contained emissions-related parts that did not conform to the specifications described in their corresponding COC applications. ALJ Initial Decision at 11. EPA and Taotao USA subsequently entered into an Administrative Settlement Agreement ("ASA") requiring Taotao USA to pay a civil penalty and to implement a compliance plan for all future new imported vehicles. *Id.* The plan specifically called for Taotao USA to submit pre-import analyses of its vehicles' catalytic converters, but Taotao USA continuously failed to comply with the ASA and ultimately paid a penalty for violating the ASA in 2012. *Id.* Given this record, EPA's decision to inspect the newly-arrived shipments is hardly surprising.

of the CAA.  *Id.*  Specifically, the inspections revealed significant discrepancies between the ratios of precious metals described in the COC applications for each engine family and the ratios actually contained in the vehicles' catalytic converters.  *Id.*

In February 2014, EPA ordered Taotao USA to test vehicles from the eight violating engine families.  *Id.*  Taotao USA hired California Environmental Engineering, LLC ("CEE") to conduct "low-hour" emissions tests of twenty-four vehicles from the eight violating engine families.  *Id.* CEE reported that all but one vehicle complied with emissions standards at the low-hour mark (though EPA later submitted evidence suggesting that the engines would not remain compliant throughout their useful life).  *Id.* at 12–13.  The twenty-three allegedly compliant vehicles were subsequently sent to SGS Canada Inc. for further testing.  *Id.* at 13.  SGS Canada Inc. found quantities of platinum, palladium, and rhodium in the catalytic converters inconsistent with those described in the vehicles' corresponding COC applications.  *Id.*

Thereafter, in March 2015, EPA and the Department of Justice ("DOJ") jointly waived the penalty limit on EPA's authority to assess penalties in administrative actions pursuant to 42 U.S.C. § 7524(c)(1), and EPA's Office of Enforcement and Compliance Assurance filed an eight-count administrative complaint against plaintiffs, alleging violations of CAA sections 203(a) and 213(d), 42 U.S.C. §§ 7522(a), 7547(d), and their implementing regulations, codified at 40 C.F.R. §§ 86.407-78, 1051.255, 1068.101.  ALJ Initial Decision at 13; EAB Final Decision at 42–43; *see* Letter from Karen S. Dworkin, Assistant Section Chief, U.S. DOJ, to Phillip A. Brooks, Dir., U.S. EPA (Mar. 17, 2015) ("DOJ 2015 Letter"), J.A. at 2, ECF No. 31-24.  The EPA administrative complaint alleged that plaintiffs manufactured, offered for sale, introduced or delivered for introduction into commerce, or imported into the United States 64,377 highway motorcycles and recreational vehicles that were not covered by COCs because their catalytic converters differed

from the specifications laid out in their COC applications, with each count corresponding to the eight engine families identified in the earlier Notice of Violation. EAB Final Decision at 48–49.

Subsequently, in December 2015 and February 2016, EPA conducted a second and third round of inspections of Taotao USA's imported vehicles for two more engine families, finding further violations of the CAA because the vehicles' catalytic converters again contained quantities of precious metals inconsistent with those described in corresponding COC applications. ALJ Initial Decision at 13. Based on these inspection results, DOJ and EPA issued an additional joint waiver to cover the noncompliant vehicles discovered in the most recent round of inspections and also waived the penalty limitation for any additional future violations as long as they were "*substantially similar* to those covered under the waivers already issued." Letter from Karen S. Dworkin, Assistant Section Chief, U.S. DOJ, to Phillip A. Brooks, Dir., U.S. EPA (June 2, 2016) ("DOJ 2016 Letter") at 1, J.A. at 2, ECF No. 31-25 (emphasis in original). Shortly thereafter, in June 2016, EPA filed an amended administrative complaint, adding Counts 9 and 10 to account for the additional violations. ALJ Initial Decision at 13. The EPA amended administrative complaint identified a total of 109,964 motorcycles and recreational vehicles manufactured by Taotao China and Jinyun, imported by Taotao USA, and belonging to ten distinct engine families, all containing catalytic converters that did not conform to their corresponding COC applications and thus were not covered by COCs as required by the CAA. EPA Am. Compl. at 8, J.A. at 9, ECF No. 30-10.

### C.    Administrative Proceedings

The ALJ issued four different orders, which served as the basis for plaintiffs' appeal to the EAB. First, Taotao China and Jinyun moved to dismiss the administrative complaint against them on the grounds that EPA had not properly served them and that EPA's regulations concerning service of process unconstitutionally circumvent the Hague Service Convention, which motion the

ALJ denied.  ALJ Order on Mot. to Quash and Dismiss (June 21, 2016) at 1–4, J.A. at 2–5, ECF No. 31-1.  In May 2017, the ALJ issued a partial accelerated decision on liability, finding all three plaintiffs liable for the violations alleged in the EPA amended administrative complaint but postponing a determination of the penalty amount.  ALJ Order on Partial Accelerated Decision & Related Mots. (May 3, 2017) ("ALJ Liability Decision") at 30–31, J.A. at 31–32, ECF No. 31-6.  Specifically, the ALJ found Taotao USA and Taotao China jointly liable for manufacturing, offering for sale, introducing or delivering for introduction into commerce, or importing 67,527 uncertified highway motorcycles and Taotao USA and Jinyun jointly liable for manufacturing, offering for sale, introducing or delivering for introduction into commerce, or importing 42,437 uncertified recreational vehicles.  *Id.* at 20, 31.  The ALJ also denied plaintiffs' motion to reconsider.  ALJ Order on Resp'ts' Mot. for Recons. or Interlocutory Appeal (June 15, 2017) ("ALJ Recons. Order") at 11, 13, J.A. at 12, 14, ECF No. 31-8.

Following a three-day hearing held in October 2017 on the penalty amount, the ALJ issued an Initial Decision, in August 2018, assessing civil penalties against all three plaintiffs, holding Taotao USA jointly and severally liable for the total penalty amount of $1,601,149.95, Taotao China jointly and severally liable with Taotao USA for $247,982.55 of the total penalty, and Jinyun jointly and severally liable with Taotao USA for $1,353,167.40 of the total penalty.  ALJ Initial Decision at 3, 50.

Taotao USA filed an appeal, which the EAB consolidated with Taotao China and Jinyun's jointly filed appeal, both of which challenged similar aspects of the ALJ Initial Decision.  EAB Final Decision at 43.  After several rounds of briefing, on March 5, 2020, the EAB affirmed the ALJ's liability and penalty determinations, as well as the ALJ's finding that service of process in this case was proper and did not violate due process.  *Id.* at 43, 50–51.

### D.     Procedural History

On April 6, 2020, plaintiffs filed the instant complaint, pursuant to the APA, 5 U.S.C. §§ 701–706, and section 205(c)(5) of the CAA, 42 U.S.C. § 7524(c)(5), seeking review of the EAB Final Decision and requesting that this Court vacate the EAB Final Decision or remand the case to the EAB with instructions to absolve plaintiffs of liability.  Compl. ¶¶ 1, 6.  After defendants received two extensions of time to file an answer, Min. Orders (June 30, 2020; Aug. 5, 2020), and plaintiffs received two extensions of time to file dispositive motions, Min. Orders (Feb. 9, 2021; Feb. 25, 2021), plaintiffs filed their motion for summary judgment on March 5, 2021, and defendants filed their cross-motion for summary judgment on April 30, 2021.  *See* Pls.' Mot. at 1; Defs.' Mot. at 1.  The pending cross-motions for summary judgment are now ripe for resolution.

## II.     LEGAL STANDARDS

### A.     Deference and Review under the Clean Air Act

The CAA provides for judicial review, under specified standards, of any civil penalty assessed by the EPA Administrator for violations of § 7522(a)(1) and § 7547(d).  42 U.S.C. § 7524(c)(5).  Section 205(c) of the Act instructs the reviewing court to set aside or remand any order assessing such a penalty only if "there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or . . . the Administrator's assessment of the penalty constitutes an abuse of discretion."  *Id.* [5]

---

[5]     The parties dispute the standard of review applicable to review of the EAB Final Decision.  *Compare* Compl. ¶ 1 (stating that this action is brought pursuant to the APA); *id.* ¶ 6 (arguing that the EAB Final Decision must be set aside based on standards set out in the APA); Pls.' Mem. Opp'n Defs.' Cross-Mot. Summ. J. & Reply Supp. Mot. Summ. J. ("Pls.' Opp'n") at 3, ECF No. 27 (arguing that the appropriate standard of review "is not whether substantial evidence supports the EAB's decision, but rather" the standards set out under APA, 5 U.S.C. §§ 706(2)(A)–(D)), *with* Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Defs.' Opp'n") at 15, ECF No. 24-1 (arguing that the appropriate standard for review is set out under 42 U.S.C. § 7524(c)(5)).  To the extent the review standards differ, contrary to plaintiffs' contention that an APA standard of review applies, the CAA clearly controls.  *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (holding that where a statute "provides a forum for adjudication, a limited class of potential plaintiffs, a statute of limitations, a standard of review, and authorization for judicial relief" such "'a precisely drawn, detailed statute pre-empts more general remedies'" and its terms "control all requests for review of [any determinations under its purview]" (quoting *EC Term of Years Trust v.*

The D.C. Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Id.* (quoting *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003)). "Substantial-evidence review is highly deferential to the agency fact-finder . . . ." *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008). Under this standard, a court "may not reject reasonable findings and conclusion, even if [the court] would have weighed the evidence differently," *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Rev. Comm'n*, 717 F.3d 1020, 1028 (D.C. Cir. 2013), but instead must "determine whether a theoretical 'reasonable factfinder' could have reached the conclusions actually reached by the [EPA] and the ALJ," *id.* (quoting *Sec'y of Lab. v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1104 (D.C. Cir. 1998)).

In tandem, the abuse-of-discretion standard applicable to the penalty assessment also affords the agency's determinations a substantial degree of deference. Under this standard, the Administrator is afforded "a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Morrissey v. Mayorkas*, 17 F.4th 1150, 1156 (D.C. Cir. 2021) (quoting *United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 345 (D.C. Cir. 2014)). Accordingly, the reviewing court "may not substitute [its] judgment for that of the [Administrator]. . . [and] cannot decide the issue by determining whether [the court]

---

*United States*, 550 U.S. 429, 433 (2007))); *see also Micei Int'l v. Dep't of Com.*, 613 F.3d 1147, 1152 (D.C. Cir. 2010) (noting that although the APA "authorizes judicial review of final agency action," its "authorization is inapplicable if another statute provides for judicial review or precludes application of the APA's judicial review provisions"). Here, 42 U.S.C. § 7254(c)(5) contains all the hallmarks of a precisely drawn, detailed statute, and thus the CAA's terms, including its specified standards of review, govern the Court's review in this case.

would have reached the same conclusion." *Id.* at 1156–57 (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021)).

In reviewing the Administrator's decision, some deference must be afforded to the agency's interpretation of its own regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019) (Kagan, J., plurality opinion) (recognizing the doctrine of deference set forth in *Auer v. Robbins*, 519 U.S. 452 (1997)). Such deference is not unlimited and only applies "if a regulation is . . . genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Id.* at 2414 (majority opinion). Even if genuine ambiguity is established, "the agency's reading must still be 'reasonable.' In other words, it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16 (citation omitted) (noting that even when the "tools" fail to resolve an ambiguity, they help to "establish the outer bounds of permissible interpretation"). Such deference is especially appropriate where, as here, "a technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations." *Howmet Corp. v. EPA*, 614 F.3d 544, 549 (D.C. Cir. 2010) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1327 (D.C. Cir. 1995)).

## B.   Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (explaining that "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make . . . a sufficient showing on an essential element of her case with respect to which she has the burden of proof"). The Supreme Court has held that "[t]hese standards are fully applicable" to motions for summary judgment under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990).

APA review involves application of similar standards of review to those brought under Section 205(c) of the CAA. *Compare* 5 U.S.C. §§ 706(2)(A), (E) (providing that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . an abuse of discretion [or] . . . unsupported by substantial evidence"), *with* 42 U.S.C. § 7524(c)(5) ("The court shall not set aside or remand any order issued in accordance with the requirements of this subsection unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the Administrator's assessment of the penalty constitutes an abuse of discretion . . . ."). As with APA cases involving cross-motions for summary judgment, in reviewing agency penalty assessment orders under 42 U.S.C. § 7524(c), "the district judge sits as an appellate tribunal," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)), since the "'entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). Thus, a court need not and ought not engage in fact finding, since judicial review, as set out in the statute, is limited to administrative record. 42 U.S.C. § 7524(c)(5); *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("It is black-letter administrative law that . . . a reviewing court should have before it neither more nor less information than did the agency when it made its decision." (cleaned up)).

## III.   DISCUSSION

Plaintiffs seek to overturn the administrative decisions and, to this end, contend that (1) the ALJ and EAB's liability determination is "unsupported by the Clean Air Act and the unambiguous language of the applicable regulations," Pls.' Mot. at 11; (2) the imposed

administrative penalty "exceeds statutory limits," *id*. at 27; (3) the ALJ erred in assessing the

penalty based on the applicable EPA penalty policy and in applying said policy, *id*. at 34, 37; and

(4) EPA's service of process violated the due process clause, *id*. at 41.  Plaintiffs' arguments fall

far short of persuading the Court that the EAB Final Decision suffers from inadequate record

support or exceeds its broad range of discretion.  The EAB engaged in reasoned decision making

that was fully explained, suffers from no errors of law, and is adequately supported by the

record.  Accordingly, the EAB's decision will not be disturbed.

> **A.      The Agency's Final Decision Reasonably Found Violations of the CAA**

Plaintiffs challenge the EAB's affirmation of the ALJ's liability determination on two

separate grounds, neither of which are availing.

> **1. *No Valid Certificate of Conformity Covered Plaintiffs' Vehicles***

Plaintiffs' chief complaint concerns the ALJ and EAB's conclusion that vehicles whose

catalytic converters do not conform to the design specifications set out in their COC applications

cannot be covered under any COC issued for vehicles described in the respective application for

certification.  Pls.' Mot. at 11–12; *see* EAB Final Decision at 57–58.  The issue before the EAB

was whether the ten COCs issued to plaintiffs between 2011 and 2015 actually covered the

109,964 highway motorcycles and recreational vehicles manufactured by Taotao China and

Jinyun and imported by Taotao USA.  For each of the ten engine families at issue, the COC

plainly states that coverage applies to "*only* those vehicles which conform, in all material

respects, to the design specifications that applied to those vehicles described in the

documentation required by" either 40 C.F.R. Part 86 (covering highway vehicles) or 40 C.F.R.

Parts 1051, 1065, and 1068 (covering recreational vehicles).  EPA COC (Aug. 29, 2013), J.A. at

2, ECF No. 32-1 (emphasis added) (covering highway motorcycles in Engine Family

ETAOC.049MC2-002); *see, e.g.*, EPA COC (May 28, 2013), J.A. at 6, ECF No. 32-1 (covering

all-terrain vehicles in Engine Family ETAOX0.12A1T-004-R01).  Without disputing that the
COC application is a part of the "documentation required by" 40 C.F.R. Parts 86, 1051, 1065,
and 1068, *see* Pls.' Mem. Opp'n Defs.' Cross-Mot. Summ. J. & Reply Supp. Mot. Summ. J.
("Pls.' Opp'n") at 11, ECF No. 27 ("[I]t is undisputed that large volume manufacturers are
required to submit COC applications . . . ."), plaintiffs posit that because each vehicle matched
the test vehicle EPA had found to conform with the applicable emission standards, the vehicles
were covered by the COCs, regardless of whether the vehicles also conformed to the design
specifications set out in their application, *see* EAB Final Decision at 58; Pls.' Mot. at 16.  Based
on this reasoning, plaintiffs conclude the liability determination is flawed.

As both the ALJ and EAB appropriately determined, *United States v. Chrysler Corp.*
controls resolution of this issue and demonstrates the fundamental legal flaw in plaintiffs'
reasoning.  591 F.2d 958 (D.C. Cir. 1979).  In *Chrysler*, the United States brought a civil action
against Chrysler for violating the CAA upon discovery that vehicles produced under a COC
"were equipped with parts different than those specified in Chrysler's application for the
certificate of compliance."  *Id.* at 959–60.  As here, "[t]he certificate by its terms covered 'only
those new motor vehicles or new motor vehicle engines which conform, in all material respects,
to the design specifications described in the application for [the] certificate.'"  *Id.* at 959 (quoting
*United States v. Chrysler*, 437 F. Supp. 94, 95–96 (D.D.C. 1977)).  As here, "[t]he government
contended that the automobiles with different parts did not conform, in all material respects, to
the design specifications described in the application and therefore were not covered by the
certificate of conformity."  *Id.* at 960.  Echoing plaintiffs' argument here, Chrysler argued that
even if a vehicle did not conform in all material respects to its COC application, it was still
covered by a COC if it met the applicable emission standards.  *Id.*  Neither the district court nor

16

the court of appeals found that argument persuasive.  Instead, the D.C. Circuit held that "[t]he language of the [applicable] regulation and applicable statutes, taken together, explicitly commands that each vehicle conform to design specifications [described in the application for certification].  Nothing indicates that compliance with emission control standards is to be the controlling standard." *Id*.  Thus, "[i]n view of the clear language of the statutes, the regulations, and the policies favoring presale certification, . . . where one or more parts erroneously installed in a vehicle are intimately related to and reasonably may be expected to affect emission controls, such vehicle is not covered by the vehicle's certificate of conformity." *Id.* at 961 (noting that "Chrysler's approach . . . would allow a manufacturer to sell vehicles without certificates of conformity if he could later prove that they meet the applicable emission standards . . . [a] result [that] would frustrate clear congressional intent . . . that vehicles pass emission tests [b]efore they may be sold to the public").

In effort to avoid the binding holding of *Chrysler*, plaintiffs point out that the decision rested on a regulation explicitly requiring material conformity while here no regulation requires that highway motorcycles must conform to the design specifications listed in their COC applications in order to be covered by a COC.  Pls.' Mot. at 23.  The ALJ and EAB reasonably dismissed this basis to distinguish *Chrysler*.  Although the regulation at issue in *Chrysler* does not apply to the vehicles at issue in this case and no longer exists, the ALJ and EAB accurately summarized why the regulations applicable in this case require adherence to *Chrysler*'s holding. EAB Final Decision at 59–62; ALJ Liability Decision at 26–29.

For highway motorcycles, EPA initially issued a regulation with identical language to the regulation for motor vehicles in *Chrysler*, mandating that each COC contain language stating that the COC "covers only those new *motorcycles* which conform in all material respects, to the

design specifications that applied to those vehicles described in the application for certification."
EAB Final Decision at 61 (emphasis added) (quoting 40 C.F.R. § 86.437-78(a)(2)(ii) (1977)).
EPA subsequently amended its regulations and removed the requirement that certain language
had to be included in each COC, so that each COC could contain uniform language rather than
having required language that would need to vary for different classes of vehicles and engine
types.  The agency explained, however, that the amendment "[did] not affect the substantive
requirements of the regulations" and would have "no effect on the motor vehicle industry, which
is familiar with these requirements."  *Id.* (alteration in original) (quoting Revisions to Motor
Vehicle Emission Certification Procedures, 46 Fed. Reg. 50,464, 50,471 (Oct. 13, 1981)).  Thus,
40 C.F.R. § 86.437-78 now simply states that COCs for highway motorcycles "will be issued . . .
upon such terms as [the Administrator] may deem necessary to assure that any new motorcycle
covered by the certificate will meet the requirements of the act" and 40 C.F.R. Part 86.  40
C.F.R. § 86.437-78(a)(2)(ii).  As detailed earlier, one of the terms the Administrator has deemed
necessary for the COCs issued for highway motorcycles in this case is that they will "cover[]
only those *vehicles* which conform, in all material respects, to the design specifications that
applied to those vehicles described in the documentation required by 40 CFR Part 86."  EPA
COC (Aug. 29, 2013), J.A. at 2, ECF No. 32-1 (emphasis added).  Far from being an obsolete
condition for coverage under a COC, the EAB and ALJ have shown that a highway motorcycle's
material conformity to the specifications detailed in the corresponding COC application has been
an enduring requirement of the applicable regulations and is solidly grounded in relevant
caselaw.  Accordingly, despite plaintiffs' desire to dodge *Chrysler* and the plain language of the
applicable regulations and issued COCs for highway motorcycles, the ALJ and EAB did not
abuse their discretion in concluding that "[t]here is simply no meaningful distinction between

18

*Chrysler* and this case."  EAB Final Decision at 62 (alteration in original) (quoting ALJ Liability

Decision at 29).

Likewise, the applicable regulations for recreational vehicles compel adherence to

*Chrysler*'s holding.  Under the governing regulations found in 40 C.F.R. Part 1068,

"[e]ngines/equipment covered by a certificate of conformity are limited to those that . . . conform

to the specifications described in the certificate and the associated application for certification."

40 C.F.R. § 1068.103(a).  Wisely, plaintiffs do not even attempt to argue that § 1068.103(a) is

inapposite from the regulation at issue in *Chrysler*.

Thus, under *Chrysler*'s binding precedent, the fact that plaintiffs' vehicles may conform

to their test vehicles, which meet the applicable emission standards, does not resolve the issue of

whether they are covered by a COC.  Instead, even if a vehicle "may, in fact, meet emission

standards," "such vehicle is not covered by the certificate of conformity" when one or more of its

parts are materially different from the design specifications described in its application for a

COC.  *Chrysler*, 591 F.2d at 959–60.

Following *Chrysler*, the EAB and ALJ determined that all the new vehicles manufactured

and imported by plaintiffs must conform, in all material respects, to the respective COC

applications but did not because "the vehicles' catalytic converters did not conform to the

approved design specifications described in the COC applications that were authorized by EPA."

EAB Final Decision at 57–58.  In *Chrysler*, the Court held that "an automobile was 'materially'

different if the difference in parts reasonably may be expected to affect emission controls."

*Chrysler*, 591 F.2d at 960.  Substantial evidence supports the ALJ and EAB's determination that

differences in a catalytic converter's volume and composition constitute a "material" difference,

for two reasons.  First, "[e]ach COC application . . . identified the catalytic converter as an

'emission related part' and contained a detailed description of the catalytic converter used for that engine family . . . includ[ing] the ratio of precious metals within each catalytic converter." EAB Final Decision at 48.  Second, the ALJ and EAB reasonably relied on the expert opinion of Dr. Ronald M. Heck, who explained how a catalytic converter's ratio of precious metals "promote[s] the desired chemical reaction . . . necessary to reduce harmful pollutants in the exhaust emissions from engines."  *Id.* (quoting Decl. of Ronald M. Heck (Nov. 25, 2016) ("Heck 2016 Decl.") ¶ 13, J.A. at 4, ECF No. 32-14).  Further, Dr. Heck discussed how changing a catalytic converter's precious metal ratio "is likely to change how the catalytic converter will perform over time."  Heck 2016 Decl. ¶¶ 16–19.[6]  Dr. Heck's opinion lines up with the CAA's regulations themselves, which group vehicles into families "whose engines are expected to have similar emission characteristics throughout their useful life" and mandate that to be in the same engine family, each engine must be identical in the volume and composition of any catalytic converters.  40 C.F.R. §§ 86.420-78(a), (b)(7); *id.* §§ 1051.230(a), (b)(5).  In short, substantial evidence in the record supports the ALJ and EAB's determination that catalytic converters and their precious metal ratios "are intimately related to and reasonably may be expected to affect emission controls," *Chrysler*, 591 F.2d at 961, and thus a failure to conform to the specifications for catalytic converters set out in a COC application means that a vehicle does not materially conform to its COC application and is not covered by the corresponding COC, EAB Final Decision at 57, 64–65.

Substantial evidence also supports the ALJ and EAB's finding that all of the vehicles manufactured and imported by plaintiffs did not conform to the catalytic converter specifications

---

[6] Plaintiffs claim that "there was no evidence of the necessity of catalyst precious metal concentrations in any particular ratio and contents to control emissions," but cite no evidence supporting this claim or contradicting Dr. Heck's opinions.  Pls.' Mot. at 12 n.37.

20

described in their respective COC applications.  Relying on the "uniformity of the manufacturing

process, the common source of the catalytic converters, [the fact] that no post-production

alterations are made to the vehicles, [the fact] that the inspected vehicles from all ten engine

families failed to match their COC application descriptions, and the Agency's expert opinion that

it was highly likely that none of the vehicles in the ten engine families would yield compliant

results," the ALJ found "sufficient evidence to conclude that none of the 109,964 imported

vehicles conform to the design specifications of their COC applications."  ALJ Liability Decision

at 30–31.  Given that plaintiffs failed to put forth any evidence during the agency proceedings to

dispute this conclusion, *id.* at 31, the ALJ's conclusion, and the EAB's affirmation of that

conclusion, easily meets the substantial evidence test.

Plaintiffs try a different tack to avoid liability by arguing that the term "specifications"

does not reasonably include the precious metal concentrations of their vehicles' catalytic

converters.  Pls.' Mot. at 14–19.  Yet, again, plaintiffs privilege their interpretations of the

regulations rather than giving deference to agency interpretations and grappling with *Chrysler*'s

clear holding.  Despite recognizing that recreational vehicles "covered by a certificate of

conformity are limited to those that . . . conform to the specifications described in the certificate

and the associated application for certification," plaintiffs contend that the term "specifications"

covers only "conditions or limitations identified by the manufacturer or EPA."  *Id.* at 18 (quoting

40 C.F.R. 1068.103(a)).[7]  Plaintiffs ignore the plain text of the regulation, which states that the

term "'specifications' *includes* any conditions or limitations identified by the manufacturer or

EPA."  40 C.F.R. 1068.103(a) (2015) (emphasis added).  As the ALJ found, and the EAB

_____

[7]      During proceedings before the ALJ, plaintiffs argued that the controlling regulation is the version of 40 C.F.R. § 1068.103(a) that took effect on December 27, 2016, and was extant during the proceedings, EAB Final Decision at 62, but in this lawsuit, plaintiffs concede that their interpretation of the term "specifications" does not turn on whether the earlier or later version of the regulation is used.  Pls.' Mot. at 18 n.44.

affirmed, "the term 'specifications' was meant to be inclusive and construed broadly such that for a vehicle or engine covered by a COC it must conform to the specifications described in the COC application . . . *and* any other conditions or limitations identified by the manufacturer or EPA as appropriate."  EAB Final Decision at 63; *see also* ALJ Recons. Order at 4 & n.4 (noting that the word "include" "is a word of extension or enlargement rather than [one] of limitation or enumeration" (citing *Am. Sur. Co. v. Marotta*, 287 U.S. 513, 517 (1933))).  Plaintiffs fail to point to any plain meaning of the term "specifications," other text in the regulation, or relevant caselaw that supports giving the term a narrow or limited construction and absolves them of having to conform their vehicles to the configurations set out in their COC applications.

Moreover, plaintiffs' argument cannot pass muster under *Chrysler*.  Plaintiffs' lamentation that the regulations do not specify that precious metal ratios must be included in COC applications misses the mark.  As *Chrysler* explains, the applicant sets the design specifications for each vehicle in an application for a COC.  *Chrysler*, 591 F.2d at 960 ("The [COC] application contains a list of vehicle parameters and specifications that reasonably may be expected to affect the output of emissions.").  Thus, the EAB correctly reasoned plaintiffs "committed to ensuring that the vehicles in each family they manufactured or imported would contain catalytic converters with the specific chemical and physical properties stated in the COC applications."  EAB Final Decision at 64.  Having failed to conform their vehicles to those specifications, plaintiffs now cannot wriggle out of liability by wishing away the requirement that plaintiffs must design their vehicles as promised in their COC applications.  Accordingly, the ALJ and EAB did not abuse their discretion in finding that all 109,964 vehicles were not covered under any of the ten issued COCs.

## 2. *Plaintiffs Taotao China and Jinyun Are Liable Under the CAA*

Plaintiffs Taotao China and Jinyun separately argue that even if their vehicles' failure to conform to their COC applications suffices to support liability under the CAA, they may not be held liable because COCs cannot be issued to foreign manufacturers. Pls.' Mot. at 24–25. This argument is entirely unpersuasive. As the ALJ and EAB found, the plain language of the CAA and its regulations clearly show Taotao China and Jinyun's actions brought them squarely under the liability provisions of the CAA. The CAA and its regulations prohibit "in the case of a manufacturer of new motor vehicles or new motor vehicle engines for distribution in commerce, the sale, or the offering for sale, or the introduction, or delivery for introduction, into commerce, or (in the case of any person . . .), the importation into the United States, of any new motor vehicle or new motor vehicle engine," or the causing of such acts, "unless such vehicle or engine is covered by a certificate of conformity." 42 U.S.C. § 7522(a)(1); *see also* 40 C.F.R. 1068.101(a)(1) (providing the same for recreational vehicles). The CAA's definition of "a person" includes corporations, 42 U.S.C. § 7602(3), and the CAA defines the term "manufacturer" to include "any person engaged in the manufacturing or assembling of new motor vehicles, new motor vehicle engines, new nonroad vehicles or new nonroad engines," *id.* § 7550(1).

Taotao China and Jinyun squarely fit within these definitions because, as corporations, they are both "persons" and were the original manufacturers of the highway motorcycles and recreational vehicles at issue in this case. *See* EAB Final Decision at 66. Both companies also introduced, or delivered for introduction into commerce, or caused to be introduced or delivered into commerce, new motor vehicles and nonroad vehicles that were not covered by a COC. Nowhere in the regulations or statutes does liability rest on the ability to hold a COC, and plaintiffs point to no authority supporting this proposition. Thus, plaintiffs' strained effort to

twist the meaning of the applicable statutes and regulations cannot withstand the plain language of these rules, and they may clearly be held liable for the violations brought by EPA under the CAA.

### B.  The Agency's Penalty Assessment Was Not an Abuse of Discretion

Plaintiffs also attack the ALJ's penalty assessment and the EAB's affirmation of that penalty by criticizing the framework chosen by the ALJ, the application of that framework, and the ALJ's determination that the violations alleged in EPA's amended administrative complaint fell under DOJ and EPA's joint penalty waiver.  Pls.' Mot. at 32–34, 37.  Each argument, however, fails to point to any evidence that would undermine the ALJ and EAB's factual findings and mostly amount to quibbles with the decisions the ALJ made within the broad range of discretion afforded to the ALJ in assessing the appropriate factors to determine the penalty amount.  In the end, plaintiffs' arguments fail to show any abuse of discretion.

Plaintiffs contend that the Mobile Source Civil Penalty Policy used by the ALJ to assess the penalty for this matter was not an appropriate framework.  Pls.' Mot. at 34–37.  This argument is easily dispatched.  In an EPA administrative assessment action, when an ALJ determines that a violation has occurred and the complaint seeks a civil penalty, the ALJ must then determine the appropriate penalty to be assessed "based on the evidence in the record and in accordance with any penalty criteria set forth in the [CAA]."  Consolidated Rules of Practice Governing the Administrative Assessment of Civil Penalties ("CROP"), 40 C.F.R. §§ 22.27(a)– (b).  The ALJ must also "consider any civil penalty guidelines issued under the [CAA]."  *Id.* § 22.27(b).  The Mobile Source Civil Penalty Policy is one such policy.  It "sets forth the policy of the [EPA] for assessing civil penalties for violations of certain [CAA] provisions concerning motor vehicles and motor vehicles engines, and non-road engines and equipment," including for violations concerning "[t]he manufacture and sale, or the importation, of uncertified vehicles or

engines."  Mobile Source Civil Penalty Policy at 1, J.A. at 6, ECF No. 31-23.  Accordingly, for the violations at issue in this matter, EPA has determined that the Mobile Source Civil Penalty Policy is the civil penalty guideline an ALJ must consider and should use "to calculate the appropriate penalty to assess under the Consolidated Rules of 40 C.F.R. Part 22."  *Id.* at 3.

Plaintiffs reference no authority barring use of the Mobile Source Civil Penalty Policy in CAA administrative assessment actions.  In fact, plaintiffs actually cite caselaw bolstering an ALJ's discretion to determine whether the unique facts and circumstances of a case warrant use of or a departure from any applicable EPA penalty policy.  Pls.' Mot. at 35 (citing *Chem Lab Products, Inc.*, 10 E.A.D. 711, 725–26 (EAB 2002) (noting EPA and its regulations require an ALJ to consider any applicable penalty policy and offer the ALJ "discretion to depart from the penalty policy guidelines where the totality of the circumstances warrant")).  Here, the CAA sets forth certain factors that must be considered when fashioning an administrative penalty, and the same factors are incorporated for consideration in the Mobile Source Civil Penalty Policy, which also provides a methodology for their application.  *See* 42 U.S.C. § 7524(c)(2); Mobile Source Civil Penalty Policy at 2–3.  Despite plaintiffs' contention to the contrary, the penalty policy specifically provides guidance for violations based on "the manufacture and sale, or importation, of uncertified vehicles or engines in violation of . . . the [CAA]," i.e., the exact type of violations at issue in this case.  Mobile Source Civil Penalty Policy at 1.  As the EAB recognized, plaintiffs' violations present no unique facts and circumstances that the policy does not take into account.  EAB Final Decision at 69.  Indeed, the policy seems tailor-made for the instant dispute since it accounts for violations that harm the regulatory scheme but may not result in excess emissions, *see* Mobile Source Civil Penalty Policy at 15, and also accounts for how to determine potential harm from excess emissions even where there is no calculation of the actual amount of

excess emissions that are attributable to the violations, *id.* at 11–14.  Thus, plaintiffs' contention that the penalty policy does not provide an appropriate framework for the violations at issue in this case is without merit.

Next, plaintiffs raise various arguments critiquing the sufficiency of the ALJ's reasoning and evidentiary support in applying the Mobile Source Civil Penalty Policy to the violations at issue in this case, but none show that the ALJ and EAB over-stepped the broad range of discretion provided by the statutory and regulatory guidelines.  Contrary to plaintiffs' view, in determining the penalty assessment, the ALJ undertook an extensive analysis of the parties' arguments and calculations and did so following the statutory factors and methodology laid out in the penalty policy, which the EAB further reviewed to ensure its application was based on ample evidentiary support.  ALJ Initial Decision at 16–50; EAB Final Decision at 69–83.  For example, plaintiffs misread the penalty policy as prohibiting a calculation of the gravity penalty component as described in the policy for violations involving uncertified vehicles, Pls.' Mot. at 35–36, when the penalty policy actually provides that the relevant method outlined for calculating "the gravity penalty component described in this Penalty Policy is not to apply to cases that involve violations *other* than uncertified vehicles or engines," Mobile Source Civil Penalty Policy at 22 (emphasis added).  Plaintiffs also take issue with the ALJ's decision to find that plaintiffs together knew about the Notice of Violation issued for the vehicles covered by the EPA amended administrative complaint's first eight counts as well as Taotao USA's previous history of noncompliance.  Pls.' Mot. at 36, 40–41.  Yet, as the ALJ and EAB found, ample evidence in the record supported both findings.  *See* EAB Final Decision at 78–79 (noting that the Notice of Violation was emailed and sent via certified mail to all parties and identifying an email in the record from EPA to both Matao Cao and Yuejin Cao regarding the Notice of

Violation); *id.* at 80–83 (identifying unrefuted evidence in the record demonstrating Taotao China and Yuejin Cao's awareness of the previous ASA).

Nor is plaintiffs' argument that the ALJ erred in determining that plaintiffs caused harm to the regulatory scheme and created a risk of potential emissions at all persuasive.  Plaintiffs continue to rely on their statement that all of the vehicles matched their test vehicles and thus could not create any risks of excess emissions or harm the regulatory scheme because analysis of the test vehicles did not show any excess emissions.  Pls.' Mot. at 37–40.[8]  As explained above, whether plaintiffs' vehicles actually matched their test vehicles is beside the point when it comes to harm to the regulatory scheme.  Plaintiffs failed to produce vehicles that conformed to their COC applications, which EPA uses to determine if vehicles will meet emissions standards for their entire useful life and to eliminate the need for testing each and every vehicle before it may be imported or sold in the United States.  By failing to produce vehicles that match the specifications used in their COC applications, plaintiffs automatically harmed the regulatory scheme because their vehicles' specifications and emissions data could not be verified without time-consuming testing, which undermines the certification scheme set up by the CAA and its regulations.  EAB Final Decision at 74–75; *see also Chrysler*, 591 F.2d at 960–61 ("We do not believe that the Congress that provided for mandatory premarketing certification, and for civil penalties for the sale of each vehicle not covered by a certificate of conformity, would have favored use of a test that conceivably could subject every automobile to emission tests after manufacture and sale.").  Furthermore, in assessing whether the imported vehicles harmed the

---

[8]     Throughout their briefing, plaintiffs consistently assert that EPA stipulated that "all [test vehicles] that Taotao USA tested for end of useful life emissions for the certification of each engine family had the same catalytic converters as the respective imported vehicles." Pls.' Mot. at 38.  Again, plaintiffs mischaracterize the record.  EPA never stipulated or jointly stipulated that fact, but instead asked the ALJ to construe the statement, made by plaintiffs, as an admission by plaintiffs, and the ALJ never adopted such a stipulation nor relied on such statement to determine liability or the appropriate penalty.  EAB Final Decision at 75–76; ALJ Liability Decision at 30–31.

regulatory scheme and posed a risk of causing excess emissions, the ALJ appropriately declined

to rely on any purported identicality to the test vehicles because there was no evidence in the

record that the test vehicles contained catalytic converters that actually matched the converters in

the imported vehicles.  EAB Final Decision at 74–76.  Thus, the emission data of the test

vehicles could not be "presumed to apply to the vehicles in this case."  *Id.* at 76 (quoting ALJ

Initial Decision at 32).

In sum, plaintiffs do not cite a single piece of evidence, caselaw holding, or other

authority that dismantles the thorough and amply supported application of the Mobile Source

Civil Penalty Policy undertaken by the ALJ.  Although, plaintiffs would have liked for the ALJ

to reach different conclusions, plaintiffs have not shown why, under the abuse-of-discretion

standard or the substantial evidence test, the ALJ and EAB's conclusions should be disturbed.

Finally, plaintiffs contend that the ALJ's penalty assessment exceeded statutory limits

because the ALJ relied on factors allegedly precluded by DOJ and EPA's joint determination to

waive the statutory penalty limit for violations sought in the underlying administrative action.

Pls.' Mot. at 32–33.  Recall, as explained *supra* in Section I.A, that the CAA sets a statutory limit

on the penalty amount that may be assessed in an administrative action for violations brought

pursuant to 42 U.S.C. §§ 7522(a)(1), 7547(d).  42 U.S.C. §§ 7524(a), (c)(1).  That limit,

however, may be waived by a joint determination of the EPA Administrator and the Attorney

General, if they both agree that "a matter involving a larger penalty amount is appropriate for

administrative penalty assessment."  *Id.* § 7524(c)(1).  Here, before filing its first administrative

complaint, EPA sought and received an agreement from DOJ to waive the administrative

assessment penalty limitation.  DOJ 2015 Letter, J.A. at 2, ECF No. 31-24.  After EPA's

investigation into plaintiffs' vehicles revealed additional recreational vehicles that were

manufactured and imported in violation of the certification requirements of the CAA, EPA

sought and received an additional joint waiver from DOJ covering these newly discovered

violations as well as any violations that might be discovered that were "*substantially similar* to

those covered under the waivers already issued."  DOJ 2016 Letter at 1 (emphasis in original).

The waiver set clear terms for what would qualify as "substantially similar" violations.

Future violations "that harm the regulatory scheme, but that do not cause excess emissions" and

future violations "of provisions on certification" were covered.  *Id*.  Future violations "that go

beyond mere harm to the regulatory scheme; that cause excess emissions; that are other than

violations of provisions on certification . . .; or that are willful, knowing, or otherwise potentially

criminal; or that increase the aggregate number of waived vehicles in the matter to over 125,000

total" would not qualify as substantially similar.  *Id.* at 1–2.

As the EAB found, the ALJ's penalty assessment for the vehicles at issue in this case

falls neatly within the provisions of the joint waiver.  EPA only brought violations for vehicles

that violated the certification provisions of the CAA, which *Chrysler* already instructs constitutes

harm to the regulatory scheme.  EAB Final Decision at 85.  Nowhere in the amended

administrative complaint does EPA allege that the violations are based on findings that the

vehicles actually caused or will cause excess emissions.  Nor does this complaint allege

violations of the CAA based on any section requiring a knowing, willful, or otherwise potentially

criminal mens rea.

Furthermore, plaintiffs cite to no authority that the joint waiver alters the criteria an ALJ

must consider in determining an appropriate penalty assessment, which includes the factors set

out in the Mobile Source Civil Penalty Policy.  In any event, the factors considered by the ALJ

do not conflict with the limitations of the joint penalty waiver.  For example, in considering the

penalty policy's "actual or potential harm" factor, the ALJ never found that plaintiffs' vehicles actually caused excess emissions, but instead appropriately focused on whether plaintiffs' activities presented a risk of excess emissions.  ALJ Initial Decision at 30–33.  Similarly, as the ALJ reasonably concluded, and the EAB affirmed, the penalty waiver did not encompass future violations that were "willful, knowing, or otherwise potentially *criminal*," DOJ 2016 Letter at 2 (emphasis added), which clearly prohibits bringing any violations that would result in criminal proceedings or require some sort of mental culpability, ALJ Initial Decision at 37–38.  The CAA, however, is a strict liability statute, and thus violations brought under its certification provisions cannot involve violations which require a criminal mens rea.  *See* Mobile Source Civil Penalty Policy at 23–24; ALJ Initial Decision at 38; EAB Final Decision at 86.  Thus, none of the factors considered by the ALJ pushed the charged violations outside the scope of the joint penalty waiver.

Accordingly, the ALJ and EAB's penalty assessment was not an abuse of discretion and was amply supported by substantial evidence in the record.

### C.     The Agency Did Not Violate Plaintiffs' Due Process Rights

In a last gasp effort to undo the ALJ and EAB decisions, Taotao China and Jinyun separately challenge EPA's service of process on them as violating their due process rights. Specifically, both plaintiffs assert that (1) their appointment of Taotao USA as a U.S.-based agent for service of process was involuntary and did not comport with due process, (2) under the Hague Convention they were required to receive a translated version of the EPA administrative complaint, and (3) the EPA regulations requiring foreign manufacturers to name a U.S.-based agent for service of process have no purpose but to impermissibly circumvent the Hague Service Convention.  Pls.' Mot. at 41–45.  The first two arguments were not raised before the ALJ. Thus, as the EAB appropriately found, these arguments are waived.  EAB Final Decision at 54.

Taotao China and Jinyun's remaining argument is completely without merit.  As plaintiffs point out, the leading case on this issue is *Volkswagenwerk Aktiengesellschaft v. Schlunk*.  486 U.S. 694 (1988).  In *Schlunk*, the Supreme Court addressed when the Hague Service Convention would govern the method of service that must be used to serve foreign defendants.  The Court concluded that the Convention does not prescribe a standard for determining when service of process is legally sufficient and thus "[i]f the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad," only then would the rules of the Hague Service Convention apply to service of process.  *Id.* at 700.

Here, Taotao China and Jinyun do not dispute that the applicable internal law of the EPA's administrative forum is the CROP, which "contains procedures for assessing administrative civil penalties under CAA sections 205(c) and 213(d), the sections under which EPA initiated this administrative enforcement matter."  EAB Final Decision at 53 (citing 40 C.F.R. § 22.1(a)(2)).  CROP § 22.5, which governs the service of process, including service on foreign corporations, 40 C.F.R. §§ 22.5(b)(1)(i)–(iii), does not require "the transmittal of documents abroad" to serve foreign corporations but instead authorizes EPA to serve foreign corporations through "*any person . . . authorized by appointment* or by Federal or State law to receive service of process," *id.* § 22.5(b)(1)(ii)(A) (emphasis added).  Without disputing that EPA properly served Taotao USA as the authorized agent for service for both Taotao China and Jinyun, plaintiffs posit that the CROP procedures and EPA rules requiring COC applicants to name a domestic agent for service of process serve no purpose but to circumvent application of the Hague Service Convention and thereby, somehow, violates their due process rights.  Pls.' Mot. at 44–45.

The Supreme Court explicitly rejected such an argument in *Schlunk*.  The Court acknowledged that its interpretation of the Convention "does not necessarily advance" the Convention's aim to ensure adequate notice in cases where service abroad is required because "it makes recourse to the Convention's means of service dependent on the forum's internal law." *Schlunk*, 486 U.S. at 705.  If the law of the forum state does not trigger the applicability of the Convention, then of course, the Convention will not be able to further its aim by ensuring its preferred methods are followed.  Nevertheless, the Court refused to believe "that this country, or any other country, will draft its internal laws deliberately so as to circumvent the Convention in cases in which it would be appropriate to transmit judicial documents for service abroad."  *Id.* Instead, the Court explained that the Due Process Clause would assure foreign nationals either of personal service, which would usually require service abroad and thereby trigger the Convention, or "substituted service that provides 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Id.* (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S 306, 314 (1950)).

Here, the CROP and EPA regulations provide such substituted service, and plaintiffs cannot seriously argue that service on their formally appointed agent for service of process from EPA, *see* EAB Final Decision at 48, is not reasonably calculated to lead to their notice of the pendency of actions against them, affording them an opportunity, as it did in this case, to present their objections.  Thus, the EAB did not abuse its discretion in holding that the internal laws employed by EPA were reasonably calculated to provide notice to the foreign plaintiffs and were not drafted purposefully to circumvent the Hague Service Convention.

**IV.     CONCLUSION**

For the foregoing reasons, plaintiffs' Motion for Summary Judgment, ECF No. 23, is

denied; and the cross-motion for summary judgment filed by defendants, ECF No. 24, is granted.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 31, 2022

_____
BERYL A. HOWELL
Chief Judge